Good morning, Your Honor. I'm John Hughes, and I represent Dr. Sarma at Elias, and I'd like to split my time in half if I could, since we have affirmative issues. And counsel, please remember, this is not a microphone. It's just a recording device, so keep your voices as loud as possible. We have competition with traffic. I understand. I will do so. And, Your Honor, I'm just going to confine my remarks to the first issue I raised in my brief, which is the economic motivation issue. I'm going to stand on the brief on the rest of it. Let me clear up something on that issue, and that concerns what's required to get a reversal here. You phrased it in terms of an abuse of discretion, but an abuse of discretion can happen a lot of different ways. And I think if you're looking for a reversal, you need to show more than simply an abuse of discretion, don't you? Well, I think I can show an abuse of discretion. Let's say that's the ground level. Right. Okay? What more do you have to show more than that? I think I have to show the abuse of discretion had an effect. What kind of effect would that be? In this case, I think the abuse of discretion was an actual legal error, and I think it was a legal error that filtered through the whole trial. But my question is, it concerns the way you phrased it in your brief. Do you have to show more than abuse of discretion? And if you do have to show more than an abuse of discretion, did you address that in your brief? I think I did. I think we showed it. I think we showed that the abuse of discretion in this case consisted of a legal error, an illegal error in terms of an improper standard of care that was allowed to be presented to the jury, and everything else flew. Maybe I'm being too coy here. Do you have to show prejudice or not? And did you argue prejudice in your brief? I believe we did. I think we have to show that you have to show that abuse of discretion had an effect. Well, just not any effect. It could have a small effect and not be of any consequence. And not be reverse of where. I understand that. But here, the abuse of discretion allowed an improper legal standard, legal standard of care, to be presented to the jury. Let me get to the bottom line once again. Do you have to show prejudice or not? Yes, I think we do have to show prejudice. And where in your brief did you argue that prejudice was shown? Let me go back and look in the brief, Your Honor. What case did you cite? Well, the Bearden case establishes the legal error that flowed throughout the entire trial. The Bearden case prohibits economic motivation in the medical malpractice case. And that case ñ That's too broad of a statement. It can't just prohibit it. In fact, Bearden allows it, but only in a very narrow manner. Okay. But here, and I mean, to get that, I mean, to jump ahead, and I perhaps am jumping ahead, but there are economic ways, as the Mead case shows, there are certain economic ways in impeachment that you can use. But it is a narrow way. It's an impeachment. The idea ñ the problem here is that in the ñ in this case, economic motivation was not used as an impeachment. It was the core of the offensive position of the plaintiff. It was the core of their case. It was that the doctor did his own test, interpreted his own test, and recommended treatment based on his interpretation of his own test. And because he has, as any physician does, a fee-for-service expectation, that economic motivation was a deviation from the standard of care. That is an improper use, I think, under Bearden. And even under Bearden, as cited in the appellate court opinion of the Mead case, it's standard law that motivates ñ I mean, it's established law, I should say, that economic motivation is not an element of a medical malpractice case. It simply isn't. And here, it was injected into the case as a core element that plaintiff was asked to prove. That is, I think, the fundamental issue in this case, and the fundamental issue that infected not only this case, it would infect any type of medical case, because obviously fee-for-service is a standard expectation of a physician. I don't think any of us would deny that. The issue here is that it takes ñ remember, Your Honor, here there was no testimony of any kind that anything the doctor technically did, he did incorrectly, that he misperformed. Well, there is an allegation that the procedures that were ñ that Dr. Lees performed were done so unnecessarily. Correct. But based off of ñ And that's ñ isn't that an allegation of negligence? But it's based off of he did it because it was allowed to be presented in the way that he did it, because he was economically motivated. That was allowed to be the theory that was presented. I understand that they said, obviously, it's unnecessary, and the reason he recommended these unnecessary procedures is this economic motivation. That is the problem. I mean, you can say ñ Well, I think an unnecessary procedure can stand on its own without a connection to the financial incentive. I don't deny that it can. You can come in and say this doctor did something that isn't going to cure the condition, and therefore it was improper to recommend that, and that was a deviation of standard of care. Absolutely you can. Let me go on to ñ you know, I'm sort of stuck on the issues that you presented, because ñ and I know you want to focus on the first issue, but the second issue also presents a problem for me, because you say that the verdict was against the manifest weight of the evidence, and you say that approximate cause was not shown, and that the standard of care was not shown. In a way, you're saying that you want to give them a second chance at proving their case by remanding for a new trial, as opposed to getting a judgment notwithstanding the verdict. I think, Your Honor, the ñ yes, I agree you can interpret that. Well, I think, isn't that ñ what remedy could ñ let's say we went with you on the second issue. What remedy could we award? There's no doubt. Absolutely. The ñ and I just question whether a new trial would flow from the nature of your argument, that no approximate cause was shown, and the evidence as to the standard of care was ñ fell short of what was required. Well, if you think that it should not be proven, that's for the court to determine. I'll leave the remedy up to the court. Well, I don't think there is ñ I don't think we have that sort of flexibility. I think the remedy is dictated by the issue that's before us, and the issue is manifest weight, and the only remedy that we can award is a new trial. And I actually ñ I agree with you. Maybe that's fine. I'm just wondering, you know, based on the arguments, whether that's really what you were looking for. Well, I think for manifest weight, the remedy is a new trial, and I don't ñ I agree ñ you're on an agreement with me. All right. The ñ I'm ñ from my perspective, Your Honor, I'd be happy to respond to any further questions, but I think the essential element in this case that is broader than this case is this economic motivation argument. Because a theory that a doctor ñ if a doctor interprets his own test and recommends treatment based on his interpretation, that that allows economic motivation ñ an economic motivation standard of care to be alleged against him. That's a very broad proposition, and that can be used in an awful lot of cases. I went to the orthopedic the other day, had an x-ray, and he looked at it and said, okay, we need to do this. He interpreted his own test. He looked at it, said, this is what we got ñ what I think we should do. Okay. But, I mean, you know, if it turned out badly, he just interpreted his own test. Let me ask you this regarding that. Yeah. Is there any evidence that an objective surgeon, had he performed this program, that the result suggesting that further operation was warranted would have been different? No. There is no evidence here. No one in the plaintiffís case attacked the veracity of the findings of the disco. They all ñ the theory was presented that this ñ everything that flew from that, excuse me, derived from that, was based on economic motivation. But no one came in and said, he found this finding in this, and he was wrong. Let me ask you regarding that, because the argument is that itís a general verdict, that there were, in fact, three separate theories that might ñ the jury could find in the plaintiffís favor, any one of which would be sufficient to uphold that general verdict, and only one of those theories connected the violation of the standard of care with the financial incentive. The others were concerned unnecessary surgery. Right. So how do we get around the general verdict? Because it all derived from the discogram and the interpretation. Hereís the first step of the chain. Without having findings, excuse me, without having those findings, the physician could not proceed to the next step. Everything that happened happened off of the findings with the discogram. He found what he found. He made the recommendations he recommended. And after several months passed, the plaintiff proceeded to the recommendations, proceeded to the surgery. You know, as I said earlier, there is no testimony that anything in either procedure, not just the first discogram, but also the second one, endoscopic spinal surgery, that anything there was undetected. He screwed up the surgery in some way. Thereís nothing like that. It all flows from this economic motivation, doing this test himself. Everything in the case flows from that. It canít be separated out and then the rest of the case will be. Because thatís the threshold proposition. Weíve got to prove deviation of standard of care. And that is the deviation that they chose to present. Itís a theory I have not heard before in medical malpractice cases, except reading about it in Bearden and also in Mead. But it is a theory that if it is allowed to stand as standard of care, offensive use by the plaintiff rather than just an appeasement, it will have, I think, a very profound effect in med mal cases. Because every doctor, as I said, as we all understand, expects to be paid in some fashion, unless itís a charity case, for his services. And, you know, he makesóexcuse me, Iím sorryóhe makes his recommendations and they may involve treatment, they may not involve treatment. Dr. Elias certainly has many patients he doesnít recommend further procedure for. This one he did. But this isósorryóthe threshold question for everything in here. And I wanted to say, just a minute, about the Mead case. Itís obviously the cornerstone of plaintiffsí position. Itís aóagain, itís a case, as I think youíve pointed out, Your Honor, that deals with impeachment, which is never recognition in this case. And it also has in itóI think a denial of care, which is what Mead is about. Itís a fundamentally different thing that weíre talking about here. And it also has an extrinsic piece of evidence. It has that capitation front that the doctor interacts with. Thereís no such extrinsic evidence here. It was aóas we all know, weíre arguing about the last paragraph of a lengthy decision. As a seconder, if you refer to the last paragraph of the appellate court decisionó and both paragraphs read quite similarly. The Supreme Court agrees with the position in the last paragraph of the appellate court decision. The appellate court cites hereóit tells us, again, that economic motivation is not part of a cause of action and a certainónot part of a standard of careóthat can be assertedó a violation of what can be asserted against a physician. I see Iíve used up more than my fair share of time. Iíd like to have a couple of minutes to respond. Thank you. Thank you. Kelly? Thank you, Your Honor. Richard Rosenblatt for plaintiff, Thomas Martinez. I guess I should start with addressing the issues that Your Honor has raised, and particularlyóand one of the responses to Mr. Hughes, I think, is telling hereó in that the argument that he presented in response to the general verdict issue is, ìIt all flows from the discogram.î Well, it doesnít all flow from the discogram. That is only one issue. And under Strino and the other general verdict cases that I know this Court is familiar with, any one of those issues is sufficient to support a general verdict. There was no special interrogatory submitted. No alternative issues instruction was submitted during the trial, and therefore thatís what we have. We have three separate issues. Any one of them is sufficient to support this verdict. All right. Thatís the verdict. But letís go to the financial evidence issue. And it seems to me that you are relying on case law that says, you know, certainly unnecessary surgery may constitute medical malpractice. Right. And certainly thereís case law that says financial incentive may be admissible to show bias. Right. And yet, it seems to me that this is a case where youíre connecting those two lines of cases and seeking to address both of those in a single case, and I wonder whether thatís proper under what the Supreme Court has said. I understand Your Honorís concern, and I think Mr. Hughesí argument makes my point. Because, in fact, it was the defendantís position that the discogram that he performed and interpreted was the justification for this surgery. Now, during the trial, he also tried to contend that Mr. Martinez had complained of radicular pain prior to this surgery, which he never did, and which the evidence, I think, very clearly established that he did not, as a separate indication for this procedure. Our experts specifically said that without radicular pain, surgery for back pain alone is not indicated. But that doesnít address the financial concerns. Iím going to address it right now. And the reason is, itís not the why that he deviated from the standard of care, which is what the, and I agree, itís not directly on all fours with me, but the issue that was addressed in need was that the why, in other words, the motivation for a physician to breach the standard of care is not an issue. Itís the how. And the how in this case is by interpreting this examination himself. A discogram, unlike a MRI. Okay, hold on. Stop right there. If you say itís really how and not why, and letís say those are really distinct concepts in our case, in our jurisprudence, I donít want to argue that point, but letís say it is a how. Yeah. How do you, assuming itís a how, how does how really address the fundamental problem? Iíll explain how, Judge, because the cases do not say it can never be relevant. They say that you have to establish a breach of the standard of care. So if our expert says he breached the standard of care by interpreting the discogram himself, that leaves open the question of why or how, in this circumstance, that is a breach of the standard of care. The jury would be left hanging without the rest of that explanation. And this is not something our experts came up with. This is in all of the medical literature. Dr. Young, their own expert, who they brought in, who is the father of this procedure, conceded that this issue is out there. It is debated within the medical community. This is not an MRI, and your Honor asked a good question. Did anybody say that the results of the discogram didnít indicate it? Well, we donít know the answer to that. And the question is, the question becomes, then, what does that financial incentive really have to do with the standard of care if the standard of care doesnít say, doesnít hold that, in fact, itís almost, youíre almost arguing that thereís a per se violation of the standard of care whenever the surgeon that performs the discogram also subsequently performs a follow-up surgery. That cannot be the state of the law. Thatís not the state of the law, Your Honor, but in this circumstance, with the indications that there were, without independent corroboration, it was two separate experts, and Dr. Young agreed that there is controversy, and he admitted to it, despite the fact that he was their expert, on this specific issue. And thatís the reason for the controversy, because there is no independent verification. Nobody else can look at that discogram. You canít look at an MRI. You can look at an MRI and objectively say, I agree or disagree with it. Discogram is an intraoperative or an intraprocedural interpretation. Youíre asking the patient, does this hurt at this level, and only Dr. Elias was present for that procedure, and nobody else would possibly have an opinion on it, and therefore he precludes any debate about whether or not his interpretation is right by performing it himself and not allowing it. Except you have a right to challenge his credibility as to whether or not it was really warranted, and you do so by cross-examining him, should he take the stand, and question him on the financial incentive that he has to perform it. But I have to question the statement that you have in your brief. It is the plaintiffís contention that Dr. Eliasís performance and interpretation of the discogram was in itself a breach of the standard of care, precisely because there was a financial incentive for him to interpret the results of the discogram in an indication. But the trouble with that is that it is a how that seems to be in violation of the holding by Justice McMurro that says that financial incentive is only introduced, cannot be introduced substantively for an element of the cause of action, but for purposes of undermining the credibility of the defendant doctor, which you say is a real concern here because he was the only one present, heís the only one who could interpret the results. And letís be fair, we canít divorce those two concepts. Dr. Elias was the first witness. Letís say you canít divorce those two concepts, but where is the authority that says you can introduce financial incentive as part of your case in chief? Your Honor, there is no authority on either side of that issue at this point because this specific issue has not been addressed in Illinois, and therefore there is no case on either side. I submit that given the facts of this case, and given that Dr. Elias did take the stand, he was the first witness and was asked about this issue, and therefore that aspect of his credibility came into play early on in the case. He insisted that the discogram justified the surgery. In fact, that was his insistence at his deposition. That was the reason that that issue had to be addressed. Did you see anything in other jurisdictions that might be informative? I am not aware of any other jurisdictions that have addressed this specific issue, no. But it is our contention that in this particularófirst of all, it was not unduly emphasized. There was not questioning about the amount of money that Dr. Elias charged for this surgery. There was not questioning with regard to other procedures that he hit. The State Council made the bold statement that there are surgery discograms that he interprets that don't result in surgery. We don't know that. That's without support. I just want to be clear about one thing, and I do apologize, Mr. Rosenberg. You're not making an overarching argument that in any case, when a doctor such as Dr. Elias would have read it himself and then performed the subsequent surgery, that that would be a per se violation. It is just this set of circumstances in which we are presented that per se violation. That is precisely true. First of all, I'm not generalizing in other medical malpractice cases, and I've not made that argument in other cases. I'm talking about the facts of this case. All right, Mr. Rosenberg, that raises the question. How do we write it so that it doesn't become a per se rule? Well, I think one very easy way to write it, Your Honor, without being facetious, is to say there's a general verdict here, and without a specific interrogatory, without an alternative issues instruction, or without any specificity on the part of what the jury's mental processes were under Strino in the cases following, that there is no way to separate out the verdict in this case from that issue. But in terms of the substantive issue, I would submit that the way it would be written is that under the facts of this case, very specifically limited to the facts of this case, because this is a diagnostic test which cannot be interpreted by it. This is not an MRI, where my expert could look at it and say, this MRI does not justify this procedure. It can't be looked at by anybody else. Dr. Elias is there intraoperatively during the procedure and interpreting it himself. All other orthopedic surgeons, my experts and others who were questioned in this case, rely on anesthesiologists or other physicians to interpret the discogram, write a report, and then use that to go on to do their surgery. That's the standard of care. That's what our experts say. Let me say this regarding the standard of care. The standard of care is what every doctor should follow under those same set of circumstances. Yes. And that means that every doctor should do exactly what every other doctor does. But when the standard of care is uncertain, that allows for the medical profession to experiment, to sometimes take on controversial treatments that may in the long run end up benefiting everyone, but it doesn't necessarily mean because there's controversy or there's criticism that the procedure followed by a particular doctor that might not be accepted by 99 percent of the other doctors is a violation of the standard of care. That's fair enough, Your Honor, but the way to experiment with that is with full disclosure. Well, but full disclosure is another cause of action that I wonder whether it was before the jury. It wasn't. It wasn't, and as I said, they raised the propriety of the discogram in his interpretation of the discogram as the reason they were allowed to go ahead with what we contend were unnecessary procedures. And, therefore, for us not to address that as a standard of care would have left open their defense. Without a response, we had to. They raised it. We had to respond to it in this context, and, therefore, we did. Mr. Rosenbaum, you're obviously a very capable lawyer, but the problem that you're for,  and the verdict is after everything has been introduced into evidence, and the question is whether the financial incentive evidence should have been introduced at all. I understand Your Honor's point, and it would have to have been so prejudicial and so overarching to have poisoned the jury. And I don't think there's, first of all, looking at what testimony was admitted, that the mere fact of it is not enough.  It wasn't emphasized, as I said. What if we were to write and say that? What evidence do you have of that, that it was not so overarching that it would poison the minds of the jury? Well, I have two points to make, Your Honor. One is, if you look at the questions and answers and the arguments, in closing arguments, there was no money mentioned, dollar figures. There was no questioning of Dr. Elias' to the amount of money he made from the procedure. There was no, not the kind of thing that courts such as this have found to be so emphasizing a particular issue to have prejudiced the jury in general. The other issue is that there was no way, there is no way to tell because there was no alternative issues instruction. There was no special interrogatory submitted, and that is not my burden. My burden is to say the general verdict supports the verdict that was entered. There is no way for this court to substitute its impression for the mental impressions or the mental processes of the jury because there was no opportunity raised as a part of the issues instructions or any of the other instructions, special interrogatories given to the jury, which would allow this court to come to that decision and therefore under the line of cases that deal with general verdict, the general verdict has to stand, and that's my position in this case. It simply hasn't carried its burden, the appellant hasn't carried its burden on this brief. I don't know if your honors want me to address the remitted or issue at all in my brief time here that's left. Obviously, we have a separate issue, and I think under Blackburn, the remitted or, Blackburn had not come down with Richardson, which was the Supreme Court case that Blackburn relies on. It was cited in the post-trial motions in response to the motion for remitted, or obviously we are dealing with an abusive discretion standard with regard to the judge's ruling on the remitted, but certainly in light of Blackburn and the reasoning of Blackburn picks up the reasoning of Richardson, the $100,000 award in addition to the $55,000 for Dr. Gutierrez's surgical procedure fee because we did not introduce specific monetary evidence with regard to the hospitalization fee. Let me ask you a question regarding that. It's an abusive discretion standard, and the judge says he didn't see any evidence to support the future medical expenses, and what do we, how do we analyze the issue? Do we say we're going to look at the abusive discretion whether a contrary result was warranted, or do we examine the record to see whether there's evidence to support the future medical expenses? I mean, which route do we take? Because if we say abusive discretion, we're just going to, we may have to be compelled to upheld his if we can't find the contract. But do we look for the evidence and say, hey, this is evidence, therefore there's an abusive discretion? I think under the Blackburn reasoning, which was the opposite, in other words, the judge denied the remitted are there, but I think what you're dealing with here is a jury verdict in either case, and so I think the abusive discretion in this context has to be focused on what the law supports, because you're not dealing with the judge admitting evidence and then a jury deciding something and then having to figure out what the jury thought. That is not the circumstance here, which is the circumstance with regard to the other issues in this case. This is a judge who looked at the law, and there wasn't a lot of case law on this issue. Richardson's an older case and deals with a separate issue, and therefore there wasn't a lot of case law to guide this judge, but the facts are there, the jury verdict is there for your honors to base a decision on. All you have to do in this circumstance is look at whether the law supported the remitted are or not and whether the judge abused his discretion by ignoring what case law there was, which is Richardson, or had a good reason to ignore that case law. And it is our position that he did ignore the existing case law, and certainly in light of Blackburn, the jury's province in fixing damages, even though specific monetary numbers are not given, has been established in this state for 20, 30 years since Richardson came down, and therefore it was an abusive discretion on Judge Barber's part to grant the remitted are in this context because there was a jury verdict on that specific issue, and like Blackburn, where the plaintiff's lawyer asked for a specific amount, and it was $5,000, and Blackburn and the jury awarded more, we did not ask for a specific amount, but the jury saw fit, based on Dr. Gutierrez's testimony, to grant damages for future medical, which encompassed the other elements which were presented to the jury, hospitalization, anesthesiology, radiology. And so I think under that standard, this Court would be justified in reversing that remitted are and reinstating the verdict. Thank you. Thank you, sir. Sir, rebuttal? I have to jump around a couple points. We've had a number of testimony about these three points that the jury, excuse me, were an instruction to the jury. They were light on the discovery. Let me raise another point regarding that. And as counsel pointed out in his brief, we got less than the complete record. We didn't get the actual instructions. We got them in oral form that the judge read, but why should I have, why should this Court have to connect what he read to the actual instruction number that would otherwise be on the instructions? You know, I do not fault you for feeling that way, Your Honor. I honestly don't know why that is. I'm faulting you, sir. I understand that. I understand. It is our responsibility. And I'm sorry for that. We had a very difficult time getting this record together. Enormous problems in the clerk's office. And it came very piecemeal. And I apologize for that. But you're right. It is my responsibility. I don't mean to imply that it isn't. The three points that were in that jury instruction. First, the form of the discovery. We discussed that. And the other two were not medically indicated, the IDAT and the scopic procedure. There is no testimony presented here by plaintiffs that those were not medically indicated because the There was no testimony. The only testimony was that that discogram should not have been economically motivated. And then everything else was economically motivated. It was almost like a presumption. It was. A implies B. There was nothing that attacked the nature of a discogram. Whether it's a faulty test or a bad test. Nothing like that. And there is, Your Honor, case law that says economic motivation is not part of a medical case. It's buried. And it was picked up in the need appellate court decision and not touched by the Supreme Court. Case law does exist. Counsel is correct when he said that Dr. Young said, yes, doctors, we discussed whether or not this should be done or not done. It is a point of discussion in the medical community. But nobody in that discussion says it violates the standard of care, except in this case. A quick point on the remitter, Your Honor. These cases, Richardson, the several fifth district cases, all deal with medical treatment that is absolutely going to be required. Absolutely going to be required. Is that like the level of evidence that's required and true? The jury, given what they feel is a little extra fudge factor, covers expenses of medical treatment that is going to happen. I mean, Richardson was caught. Obviously he was going to have medical treatment. I forget which one of the fifth district cases the fellow was exposed to asbestos and needed monitoring to see if he was going to develop asbestosis. It was a treatment that medically was required to be done. Here we have a plaintiff that met with Dr. Gutierrez in 2002, April of 2002. In September of 2008, when we had this trial, he hadn't seen a doctor in years. He was back fully working. He was taking occasionally over-the-counter drugs. He had no appointments scheduled. There's no evidence he was ever going to have this surgery. Did you file a motion to eliminate, to bar that sort of evidence from being introduced into the future medical expenses, in light of his lack of medical treatment during the preceding four or five years? I couldn't file a free trial because I didn't know that he hadn't seen it up to that point until I resetted the trial. So I couldn't file a free trial motion. But literally, he's had no medical involvement in years of any kind. And he takes some ibuprofen or some aspirin from time to time, and that is it. And when he saw Dr. Elias in November, just before his surgery, he could only sit for 30 minutes. Now he's driving around full time on his job because that's what he does. It's a job where he has to drive around in his car all over northern Illinois. So this is not the type of medical treatment that is discussed in Richardson and its project. This is a whole different ballgame. Medical treatment is not likely to ever take place. Thank you. Thank you, Counsel.